**Francis E. MAYER, Plaintiff,**

v.

**UNIVERSITY OF MINNESOTA, Defendant.**

**Civil No. 4–95–444.**

United States District Court, D. Minnesota, Fourth Division.

Oct. 15, 1996.

Charles Leo Friedman, Friedman Law Office, Minneapolis, MN, for plaintiff.

Tracy M. Smith, University of Minnesota, Minneapolis, MN, for defendant.

## MEMORANDUM OPINION AND OR-DER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TUNHEIM, District Judge.

Plaintiff, Francis E. (Butch) Mayer, a former employee of the University of Minnesota, filed a Complaint with this Court alleging that the University of Minnesota ("University") discriminated against him on the basis of his disability in violation of the Vocational Rehabilitation Act of 1973, 29 U.S.C. §§ 701, et seq., the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq., and the Minnesota Human Rights Act, Minn.Stat. §§ 363.01, et seq. Plaintiff was employed by the University of Minnesota as an Electrical Construction Superintendent from August 1987 through January 1992, when his position was eliminated and he was laid off. During this period of employment, in 1988, plaintiff was injured on the job and became disabled, but was able to continue working for the University after his injury with certain accommodations. After plaintiff's position was eliminated, he applied for several positions at the University and was rehired in February 1992 as a Planner/Scheduler, a position with a one-year probationary period. On May 28, 1992, plaintiff was failed on his probationary period and terminated. Plaintiff alleges that he was terminated due to his disability and that the University failed to provide reasonable accommodations for his disability during his employment as a Planner/Scheduler.

The matter is before the Court on defendant's motion for summary judgment. Defendant asserts that the Eleventh Amendment bars this Court from asserting jurisdiction over both plaintiff's state and federal law claims. Defendant also argues that if the Court finds the state is not immune from suit under the Eleventh Amendment, the University is nevertheless entitled to summary judgment on the ground that plaintiff has failed to demonstrate the existence of a genuine issue of material fact in dispute and defendant is entitled to judgment as a matter of law.

## I. ELEVENTH AMENDMENT IMMUNITY

### A. State law claim.

■ Defendant asserts that the Eleventh Amendment bars federal court jurisdiction over plaintiff's state law claim under the Minnesota Human Rights Act (MHRA), and that plaintiff's MHRA claim must be dismissed. The Eleventh Amendment bars federal court jurisdiction over state law claims against unconsenting states or state officials when the state is the real, substantial party in interest, regardless of the remedy sought. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1983). This constitutional bar applies with equal force to pendent state law claims. *Id.* at 120–21, 104 S.Ct. at 918–19. The Eighth Circuit Court of Appeals has conclusively established that the University of Minnesota is an instrumentality of the state and is therefore entitled to share in the state's Eleventh Amendment immunity. *Treleven v. University of Minnesota*, 73 F.3d 816 (8th Cir.1996).

■ Unless the state of Minnesota has consented to be sued in federal court for violations of the Minnesota Human Rights Act, this Court lacks jurisdiction over plaintiff's state law claim. The state may waive its Eleventh Amendment immunity only by "the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974). Plaintiff does not argue that the state's adoption of the Minnesota Human Rights Act, or any language in the Act, constitutes such a waiver of the state's Eleventh Amendment immunity to state law claims in federal court. This Court therefore finds it lacks jurisdiction over plaintiff's MHRA claim.

### B. Federal law claims.

Defendant also argues that under the recent decision of *Seminole Tribe v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Eleventh Amendment bars this Court from asserting jurisdiction over

plaintiff's federal ADA and Rehabilitation Act claims against the state. In *Seminole Tribe,* the United States Supreme Court held that Congress may abrogate the states' sovereign immunity under the Eleventh Amendment only if Congress has unequivocally expressed its intent to abrogate the immunity and has acted pursuant to a valid exercise of power. *Id.* at ——, 116 S.Ct. at 1123.

■ The Court must first determine whether there are "clear legislative statements" that Congress unequivocally intended to abrogate the states' immunity when it adopted the Rehabilitation Act of 1973 and the Americans with Disabilities Act. *See Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1123. Congress' intention to abrogate the states' immunity must be "unmistakably clear in the language of the statute." *Id.* at ——, 116 S.Ct. at 1123 (citation omitted); *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 243, 105 S.Ct. 3142, 3148, 87 L.Ed.2d 171 (1985) (intent must be found in the language of the statute itself).

■ The Court finds that Congress explicitly indicated its intention to abrogate the states' sovereign immunity in both the Americans with Disabilities Act and in amendments to the Rehabilitation Act of 1973. The Supreme Court in the 1985 *Atascadero* case held that there was no specific legislative expression of an intent to abrogate the states' immunity in the Rehabilitation Act. After the *Atascadero* case, however, Congress indicated its clear intention to apply the act to the states and effectively nullified the *Atascadero* decision. In the Rehabilitation Act Amendments of 1986, § 1003, now codified in 42 U.S.C. § 2000d–7(a)(1), Congress stated:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C.A. § 794].

Other federal courts have held that this language expressed Congress' intent to abrogate the states' immunity to suit under the Rehabilitation Act. *See Lussier v. Dugger,* 904 F.2d 661, 669 (11th Cir.1990); *Eisfelder v. Michigan Dept. of Natural Resources,* 847 F.Supp. 78, 82–83 (W.D.Mich.1993); *Joshua B. v. New Trier Township High Sch. Dist. 203,* 770 F.Supp. 431, 434 (N.D.Ill.1991); *McGuire v. Switzer,* 734 F.Supp. 99, 108 (S.D.N.Y.1990). Similarly, the ADA in 42 U.S.C. § 12202 contains an unequivocal indication of Congress' intent to abrogate:

> A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

Therefore, the first part of the *Seminole Tribe* inquiry is satisfied for both federal statutes at issue.

■ The second inquiry mandated by *Seminole Tribe* is whether Congress abrogated the states' immunity pursuant to a valid exercise of its power. In *Seminole Tribe,* the Court stated that only two sources of authority to abrogate Eleventh Amendment immunity had been previously recognized, the Fourteenth Amendment and the Interstate Commerce Clause. *Id.* at ——, 116 S.Ct. at 1125. The Court then expressly overruled the plurality opinion in *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which had held that Congress had authority to abrogate the states' immunity pursuant to the Interstate Commerce Clause. *Id.* at ——, 116 S.Ct. at 1128. Thus, the only remaining authority for Congressional abrogation of the states' immunity recognized in *Seminole Tribe* is the enforcement provision of the Fourteenth Amendment. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

■ The issue before this Court is whether Congress enacted the ADA and the Rehabilitation Act pursuant to a valid exercise of its powers under § 5 of the Fourteenth Amendment. Defendant argues that Congress did not have the authority under

the Fourteenth Amendment to enact the ADA and the Rehabilitation Act. The Court must consider defendant's argument in light of the Supreme Court's recognition that Congress need not expressly invoke its authority under the Fourteenth Amendment to support an exercise of that power. *EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983). Rather, the question is whether the Court is able to "discern some legislative purpose or factual predicate that supports that exercise of power." *Id.*

In enacting the ADA, Congress specifically stated that it was Congress' purpose "to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce...." 42 U.S.C. § 12101(b)(4). In the findings section of the statute, Congress clearly stated its view that the purpose of the ADA is to combat discrimination against disabled persons and provide legal recourse for such discrimination. *See* 42 U.S.C. § 12101(a)(7) ("individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society ..."); 42 U.S.C. § 12101(a)(9) ("the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis ..."); 42 U.S.C. § 12101(a)(4) ("individuals who have experienced discrimination on the basis of disability often have had no legal recourse to redress such discrimination").

Although there is no express statement in the Rehabilitation Act that Congress enacted the statute pursuant to the Fourteenth Amendment, the Supreme Court in its *Atascadero* decision presumed that Congress had done so. *Atascadero,* 473 U.S. at 243–244, 105 S.Ct. at 3147–48. The 1992 amendments to the Rehabilitation Act amended the findings and purpose sections of the Act, which state that the goal of the Act is to combat the effects of discrimination against persons with disabilities. 29 U.S.C. § 701(a)(2) (as amended) ("individuals with disabilities constitute one of the most disadvantaged groups in

society"); 29 U.S.C. § 701(a)(5) (as amended) ("individuals with disabilities continually encounter various forms of discrimination ..."). Neither party has provided the Court with any legislative history surrounding the enactment of the Act, but there is nothing in the Act itself which leads this Court to conclude that the Supreme Court was incorrect in presuming that Congress intended to enact the Rehabilitation Act pursuant to the Fourteenth Amendment.

In support of its argument that the ADA and the Rehabilitation Act could not have been enacted pursuant to the Fourteenth Amendment despite the clear Congressional intent to do so, defendant cites the Supreme Court's decision in a case involving the constitutionality of another federal remedial statute, the Age Discrimination in Employment Act (ADEA). In *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1982), a five-member majority of the Court upheld the constitutionality of the ADEA as a valid exercise of Congressional power under the Commerce Clause. Although the *Wyoming* majority specifically declined to decide whether the ADEA could also have been upheld as an exercise of Congress' powers under § 5 of the Fourteenth Amendment, *id.* at 243, 103 S.Ct. at 1064, the dissenting justices disagreed that the Commerce Clause provided a valid basis for Congressional authority and thus went on to discuss whether the Congress had such authority under the Fourteenth Amendment. *Id.* at 258–59, 103 S.Ct. at 1072. The dissenting justices noted that the Supreme Court had previously examined mandatory retirement schemes like the one challenged in *Wyoming* under a rational basis standard, and that the case did not involve a fundamental right or protected class, and concluded that "it cannot be said that in applying the Age Act to the states Congress has acted to enforce equal protection guarantees as they have been defined by this Court." *Id.* at 261, 103 S.Ct. at 1073. The dissenters disagreed with the notion that Congress can define rights independently of Supreme Court case law, stating, "[a]llowing Congress to protect constitutional rights statutorily that it has independently defined fundamentally alters our scheme of government." *Id.* at 262, 103 S.Ct. at 1074.

Defendant asks the Court to adopt the reasoning of the dissenting justices in *Wyoming* and apply it to the statutes at issue in the instant case. Defendant argues that like age discrimination, disability discrimination is subject only to rational basis review by the Supreme Court, and therefore Congress had no authority to enact the ADA or the Rehabilitation Act pursuant to the Fourteenth Amendment. *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 442, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985) ("mental retardation" not a "quasi-suspect classification"); *More v. Farrier*, 984 F.2d 269, 271 (8th Cir.), *cert. denied*, 510 U.S. 819, 114 S.Ct. 74, 126 L.Ed.2d 43 (1993) (wheelchair-bound inmates not a suspect class); *Welsh v. City of Tulsa*, 977 F.2d 1415, 1420 (10th Cir.1992) (handicapped persons not a suspect class for equal protection purposes). Defendant argues that because the Fourteenth Amendment does not include the disabled within the classes protected by its guarantee of equal protection under the law, and the Supreme Court has not held that classifications affecting the disabled are subject to any heightened scrutiny under the Equal Protection Clause, Congress lacked the authority pursuant to the Fourteenth Amendment's enforcement provision to prohibit states from discriminating against individuals on the basis of their disabilities or to subject states to suits in the federal courts for redress for such discrimination.

The Court is unpersuaded by defendant's argument. Defendant has not demonstrated that the legislative history, purposes, and statements of Congressional authority in the ADA and Rehabilitation Act are similar to those in the ADEA with respect to the dissent's analysis in *Wyoming*. *See MacPherson v. Univ. of Montevallo*, 938 F.Supp. 785 (N.D.Ala.1996) (Congress enacted the ADEA with the Fair Labor Standards Act in 1967 with an express invocation of authority under the Commerce Clause). More importantly, the reasoning of the dissenting justices is nothing more than that—the Supreme Court has never held that the ADA and the Rehabilitation Act could not have been enacted pursuant to the Fourteenth Amendment. Even the dissenting justices in *Wyoming* stated that they "need not resolve" in their

dissent "the ability of Congress to define independently protected classes," *Wyoming*, 460 U.S. at 260 n. 6., 103 S.Ct. at 1072 n. 6., and that their dissent should not be read to "say definitively that age discrimination is not protected by the Fourteenth Amendment." *Id.* at 261 n. 7, 103 S.Ct. at 1073 n. 7.

Defendant's argument presumes that because classifications involving disabled persons have been reviewed by the Supreme Court under a rational basis standard, disabled persons have no rights under the Equal Protection Clause, and Congress therefore may not act to prohibit states from discriminating against disabled persons. As the Supreme Court stated in *Seminole*, however, it has previously recognized that:

> the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution. We noted that § 1 of the Fourteenth Amendment contained prohibitions expressly directed at the States and that § 5 of the Amendment expressly provided that "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment.

*Seminole*, —— U.S. ——, 116 S.Ct. at 1125 (citations omitted). The Equal Protection Clause of the Fourteenth Amendment limits states' ability to discriminate on the basis of classifications. The fact that the Supreme Court has subjected governmental classifications involving suspect classes to a higher level of scrutiny than other classifications does not prevent Congress from finding that another class of persons has been subjected to a history of unequal treatment and legislating pursuant to its enforcement powers under the Fourteenth Amendment to protect that class of persons from arbitrary discrimination.

Congress made findings in the ADA that disabled persons "are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society" and enacted the ADA and the Rehabilitation Act to combat discrimination against disabled persons. In doing so, Congress explicitly invoked its authority under the Fourteenth Amendment, and stated that it was acting with the purpose of eliminating arbitrary discriminatory conduct. The Court therefore concludes that Congress enacted both statutes pursuant to a valid exercise of its authority to enforce the Equal Protection Clause of the Fourteenth Amendment. The state is not entitled to Eleventh Amendment immunity from plaintiff's ADA and Rehabilitation Act claims.

## II. ADA AND REHABILITATION ACT CLAIMS

### A. Facts.

The facts relevant to plaintiff's claims are those related to the University's accommodation of plaintiff's disability during his employment as a Planner/Scheduler and plaintiff's termination in May 1992.[1] The basic facts surrounding plaintiff's employment as a Planner/Scheduler are undisputed. The position of Planner/Scheduler was a new position created as part of a restructuring of the University's Department of Facilities Management; the position was subject to a one-year probation period during which the employee could be terminated without cause. Facilities Management divided the University into seven geographic zones, each of which had a Zone Manager who reported to the Director of Operations for Facilities Management. In early 1992, Facilities Management began implementing a new computer program called "MAPS" to schedule maintenance in the various zones. A requirement of the Planner/Scheduler position was to learn and use the MAPS system.

During plaintiff's employment, plaintiff's disability required him to use a leg brace and a cane. While plaintiff was being considered for the Planner/Scheduler position, he requested assignment to the Health Sciences zone as a first choice, and the St. Paul zone as a second choice. He also asked for accommodation of absences for surgeries, medical appointments or when he was unable to walk on his ankle, and for accessible parking. Plaintiff was hired to begin work on February 26, 1992, and assigned to his first choice of locations, the Health Sciences zone. Plaintiff's parking needs were accommodated to his satisfaction while he worked in the Health Sciences zone. Plaintiff's manager in the Health Sciences zone was Sam Talbert.

Plaintiff's first four weeks on the job were spent in group computer training for all Planner/Schedulers. The training on the MAPS system was conducted by an outside consultant, Doug Fuhs. The Project Manager for the MAPS system was Ken Martin. Martin, Fuhs, the zone managers, and the Director of Operations to whom they reported were all involved in implementing the new MAPS system. In March 1992, Robert Schenkel became the Director of Operations for Facilities Management. Schenkel met and spoke routinely with the other management personnel responsible for the MAPS system regarding progress of the system and progress of the Planner/Schedulers who were learning the system.

The computer training plaintiff was required to attend was conducted in the Shops Building on the University's Minneapolis campus. The Shops Building had two sets of stairs plaintiff had to negotiate to reach the training site. There were two elevators available for plaintiff's use, but plaintiff found them difficult to use. Plaintiff mentioned to his supervisors that he was having difficulty with the stairs in the Shops Building, but did not request any assistance in using the elevators. Plaintiff was generally permitted to park in the lot adjacent to the Shops Building when attending training. When the lot was full, plaintiff was able to park in nearby handicapped parking spots. On three occasions, plaintiff was unable to find parking in

---

1. Plaintiff does not challenge any aspect of his employment as an Electrical Construction Super-intendent or his termination from that position.

either of these locations. Plaintiff did not complain to management about problems parking at the training site.

On April 13, 1992, plaintiff was transferred to his second choice of location, the St. Paul zone. The decision to transfer plaintiff was made by Robert Schenkel, Director of Operations. Plaintiff was not informed of the reason for his transfer. Plaintiff's first supervisor on the St. Paul campus was Zone Manager Jerry Brenden, but Brenden left the position several weeks after plaintiff arrived. Eric Kruse, a zone manager for another zone, was temporarily assigned to also manage the St. Paul zone.

Plaintiff's work location in the St. Paul zone required that he climb eight to ten steps to enter the building and more steps to reach his office on the second floor. There was an elevator plaintiff could use inside the building, but it was locked at 4:30 p.m. Plaintiff requested a key to the elevator from Jerry Brenden. Brenden indicated that he would get plaintiff an elevator key, but left his position before doing so. Plaintiff did not request a key from the new zone manager, Eric Kruse.

Plaintiff had no difficulty parking while working at the St. Paul campus until his former department requested that he return his parking sticker. At that time, plaintiff requested another sticker from Eric Kruse. Kruse indicated he would see what he could do. Plaintiff was without a parking sticker for the last two weeks of his employment which caused him to park illegally on several occasions when visiting job sites, but did not cause plaintiff to get a ticket or suffer any adverse physical consequences.

Plaintiff was failed on his probationary period on May 28, 1992. He was given a written evaluation by Robert Schenkel and written notification of his termination. Plaintiff alleges that the decision to terminate him was based on his disability. He also claims that defendant failed to provide him with reasonable accommodations for his disability. Defendant responds that plaintiff was terminated for poor performance and that the University accommodated plaintiff's disability during his employment.

## B. Analysis.

### 1. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under that rule:

[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Initially, the movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the movant's showing, the evidence offered by the non-moving party is to be believed and all justifiable inferences therefrom are to be drawn in the light most favorable to that party. *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Where a moving party makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of its pleadings; rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). Accordingly, the nonmovant "must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial." *Wilson v. Southwestern Bell Telephone Co.*, 55 F.3d 399, 405 (8th Cir. 1995).

## 2. Plaintiff's termination.

 Claims of discrimination brought under the ADA and the Rehabilitation Act must be analyzed under the *McDonnell Douglas* burden-shifting framework. To establish his initial prima facie case, a plaintiff must demonstrate that he is a disabled person within the meaning of the statutes, that he was qualified to perform the essential functions of the job with or without a reasonable accommodation, and that he suffered adverse employment action under conditions which raise an inference of unlawful discrimination. *Price v. S–B Power Tool,* 75 F.3d 362, 365 (8th Cir.1996). If the plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* at 365. If the defendant meets that burden, plaintiff must demonstrate that the defendant's explanation is pretextual and discrimination is the real reason for the decision. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

 There is no dispute that plaintiff is disabled within the meaning of the ADA and the Rehabilitation Act and that he suffered an adverse employment action. Defendant asserts that plaintiff cannot establish a prima facie case because there are no facts from which an inference of discrimination arises in connection with plaintiff's termination. Plaintiff asserts that an inference of discriminatory motive is raised by comparing plaintiff's treatment to the treatment of two other Planner/Schedulers, Geneva Turner and Robert Sorenson.

Both Turner and Sorenson were hired at the same time plaintiff was hired. Both were initially supervised by Sam Talbert, the same zone manager who supervised plaintiff before he was transferred to the St. Paul zone.

When it was determined that Turner and Sorenson were not performing satisfactorily, Talbert gave each a written review and an opportunity to correct the deficiencies. As part of the opportunity to improve, Geneva Turner, like plaintiff, was transferred to a new zone. Turner, however, was told that she needed to improve her performance after the transfer. Neither Turner nor Sorenson were ultimately terminated. Plaintiff was the only Planner/Scheduler terminated. Plaintiff further asserts that he was treated differently from other Planner/Schedulers because others got formal oral evaluations with Fuhs and he did not. Plaintiff admitted that he had such an evaluation scheduled, but it was canceled at his request due to a disability-related absence. The evaluation meeting was rescheduled, but plaintiff was terminated before it occurred.[2]

Plaintiff also points to evidence that prior to the decision to terminate him, Schenkel requested that the zone managers who had supervised plaintiff submit records of plaintiff's absences to him. Plaintiff argues that this request constitutes circumstantial evidence supporting the inference that plaintiff was actually terminated due to his disability-related absences. Although defendant argues that it could discriminate against plaintiff without violating the ADA because attendance is an essential function of a job, it did not demonstrate that poor attendance kept plaintiff from performing the essential functions of his job; in fact, defendant argued that there was no link between plaintiff's absences and his performance or his termination. Defendant has not explained why Schenkel requested the record of plaintiff's absences or how the information obtained affected the decision to terminate plaintiff.

---

2. Plaintiff asserts that he was also treated differently because he got less information about the Planner/Scheduler position due to his absences from training which were caused by his disability. The Court finds this difference insignificant, however, because plaintiff also testified that he missed only two sessions and was able to get notes from other attendees.

Plaintiff also alleges that evidence of a failure to provide reasonable accommodations for his disability is relevant to the defendant's motive for terminating him and should be considered by the Court in its *McDonnell Douglas* analysis of plaintiff's evidence. Even if the Court were to view such evidence as probative of discriminatory intent, as plaintiff requests, as discussed *infra* at II. B. 3., the Court finds plaintiff has failed to demonstrate that defendant denied him reasonable accommodations for his disability.

Defendant responds that the fact that plaintiff was the only Planner/Scheduler terminated out of twelve hired is statistically insignificant. Defendant did not explain the difference in treatment between plaintiff and Turner and Sorenson. Defendant argues that the difference in treatment is not significant because Turner and Sorenson had a different zone manager than plaintiff had at the time he was terminated. Plaintiff, however, had the same zone manager Turner and Sorenson had when problems were first noted with his performance. Defendant did not explain why Talbert gave Turner and Sorenson evaluations and an opportunity to improve, while plaintiff was transferred without an evaluation or an explanation of what improvement was necessary and terminated shortly thereafter.

In response to plaintiff's claims of differential treatment, defendant submitted unrebutted evidence that Schenkel, the decision maker in plaintiff's termination, terminated other non-disabled Facilities Management employees who were under his direct supervision without any written evaluation or opportunity to improve. Defendant asserts that plaintiff's experience must be evaluated in light of this larger pool of employees. Defendant also argues that none of the facts asserted by plaintiff establish an inference of discrimination. The Court finds that, although plaintiff's evidence raises only the barest inference of discrimination, defendant has not adequately explained the differential treatment plaintiff received so as to establish that plaintiff has not demonstrated a prima facie case.

■ Defendant asserts that it had a legitimate, nondiscriminatory reason for terminating plaintiff based on problems with his performance. Defendant asserts that Robert Schenkel made the decision to terminate plaintiff based on reports he received that plaintiff was not successfully learning the MAPS system, that he did not have a consistent understanding of building systems, and that he did not demonstrate a willingness to learn the new customer-service philosophy of Facilities Management. These were the reasons stated on the written evaluation Schenkel gave plaintiff upon his termination.

Schenkel states in his affidavit that during his routine meetings with zone managers and trainers Ken Martin and Doug Fuhs, he had received several reports that plaintiff's performance was unsatisfactory.

Defendant also points to testimony corroborating Schenkel's affidavit. Doug Fuhs, the computer consultant responsible for training the Planner/Schedulers, described plaintiff in a written evaluation as "Below Average" and wrote that plaintiff "had trouble understanding the software and is going to need a lot of help." He also wrote that plaintiff "thinks he knows a lot more about the software and what is required of him than he actually does. His activities should be monitored closely and controlled. He could very easily head down the wrong path." Frederick Clayton, plaintiff's co-worker in the St. Paul zone, testified that Fuhs expressed some concerns to him about plaintiff's job performance. Sam Talbert, plaintiff's manager in the Health Sciences zone testified that he recalled Fuhs saying that plaintiff "was not catching on as fast as some of the other planners or he didn't understand what was going on." Eric Kruse, plaintiff's manager in the St. Paul zone recalled that during the meetings of zone managers and Fuhs and Martin to discuss progress with the MAPS system and the progress of the Planner/Schedulers, Fuhs said that plaintiff was "in the lower part of his peers." Schenkel states that the reason for transferring plaintiff to the St. Paul campus was to give him an opportunity to improve his skills by working with a Planner/Scheduler with strong skills, but that after the transfer he continued to receive negative reports about plaintiff's performance and therefore decided to terminate him. Although plaintiff's zone manager would ordinarily have made such a decision, Schenkel states that he made it himself because plaintiff's zone manager was new to the zone and had only worked with plaintiff for several weeks.

Defendant asserts that plaintiff has not demonstrated that its legitimate reason for terminating plaintiff was a pretext for discrimination. Plaintiff has not offered additional evidence of pretext, but the Court finds that defendant has not demonstrated

**1484**

that there are no genuine issues of material fact in dispute with respect to its reasons for terminating plaintiff. Although defendant has submitted unrebutted evidence that there were negative reviews of plaintiff's performance, plaintiff has submitted unrebutted evidence that he was treated differently from other Planner/Schedulers who also had performance problems. Defendant has not explained why plaintiff was treated differently from these employees. Although plaintiff's circumstantial evidence of discrimination is a slim reed, viewing the evidence in the light most favorable to plaintiff the Court cannot say defendant has demonstrated that no reasonable jury could find that discrimination was a motivating factor in plaintiff's termination.

### 3. Reasonable Accommodation

 Plaintiff testified that he asked for three specific accommodations: (1) assignment to the Health Sciences zone or the St. Paul zone; (2) assistance with parking; and (3) days off for surgeries and medical appointments and time off when he could not walk on his ankle. Plaintiff concedes he was assigned to the locations he requested. He was assigned to his first or second choice of location at all times during his employment. Plaintiff testified that he had parking arrangements which were acceptable to him at all times except for occasional training days and during the last two weeks of his employment while he waited for his zone manager to "see what he could do" about getting him a University parking permit. Plaintiff does not allege that the University refused any request he made related to parking. Plaintiff also admits he was never denied time off he requested.

Plaintiff also claims that the University failed to make his various work sites more handicapped accessible. Plaintiff complains that he had to negotiate stairs both at the Shops Building where the computer training was held and at his St. Paul zone worksite. Plaintiff admits, however, that there were elevators available in the Shops Building and that he did not request any assistance in using the elevators or any other specific accommodation at the Shops Building. He admits that there was an elevator available to

him in the St. Paul building, but complains that he was not given a key to use it after 4:30 p.m. when it was locked for the evening. Plaintiff also testified, however, that his first supervisor in St. Paul promised him an elevator key when he requested one, but that this supervisor left soon afterward and that he did not request an elevator key from his new supervisor.

The Court finds that plaintiff has failed to demonstrate there are disputed issues of material fact with respect to his claim that the University failed to accommodate his disability. Based on the facts plaintiff alleges, viewed in the light most favorable to plaintiff, no reasonable jury could conclude that the University failed to provide reasonable accommodations for plaintiff's disability. Defendant is entitled to judgment as a matter of law on any claim that it failed to provide plaintiff with reasonable accommodations.

### ORDER

Accordingly, based on the above and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

(1) Defendant's motion for summary judgment [Docket No. 30] on plaintiff's Minnesota Human Rights Act claim is **GRANTED** and Count III of plaintiff's complaint is hereby **DISMISSED WITHOUT PREJUDICE;**

(2) Defendant's motion for summary judgment [Docket No. 30] on plaintiff's Rehabilitation Act claims is **DENIED** as to plaintiff's claim that he was terminated due to his disability; and

(3) Defendant's motion for summary judgment [Docket No. 30] on plaintiff's Americans with Disabilities Act claims is **GRANTED** as to any claim that defendant failed to provide plaintiff reasonable accommodations for his disability.