**Jock Orville AUTIO, Plaintiff,**

v.

**STATE OF MINNESOTA and AFSCME Local 3139, Defendants.**

Civil No. 3–96–383.

United States District Court,
D. Minnesota,
Third Division.

July 2, 1997.

Steven E. Rau, Rau & Floyd, Minneapolis, MN, for Jock Orville Autio.

Robert Michael Small, U.S. Atty. Office, Minneapolis, MN, Joan A. Magagna, John L. Wodatch, Jeanine M. Warden, Washington, DC, for U.S.

Gregg M. Corwin, Karin E. Peterson, Corwin Law Office, St. Louis Park, MN, for AFSCME, Local 3139.

Steve W. Gunn, Melissa L. Wright, Minn. Atty. Gen., St. Paul, MN, for State of Minnesota.

## MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon Defendant State of Minnesota's Motion to Dismiss pursuant to Rule 12(b)(6) and Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the reasons stated below, the Court denies Defendant's motion.

## BACKGROUND

In October 1984, Plaintiff Jock Orville Autio ("Autio") began his employment with Defendant State of Minnesota (the "State") as a store clerk at the Central Store for the Materials Management Division of the Minnesota Department of Administration. Autio is a member of Defendant AFSCME Local 3139 (the "Union"). Due to a physical condition, Autio sought an accommodation from the State, which was not provided. Likewise, his request for assistance from the Union was unavailing. Without reasonable accommodation, Autio's employment duties aggravated his physical condition, resulting in injury.

Autio then brought suit alleging unlawful employment practices in violation of the Americans with Disabilities Act (the "ADA" or "Act"), the Minnesota Human Rights Act, and the Minnesota Workers' Compensation Act. The State now brings this motion to dismiss all of Autio's claims.

## STANDARD OF REVIEW

For the purposes of Defendant's Motion to Dismiss, the Court takes all facts alleged in Plaintiff's Complaint as true. *See Westcott v. Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990). Further, the Court must construe the allegations in the Complaint and reasonable inferences arising from the Complaint favorably to Plaintiff. *See Morton v. Becker,* 793 F.2d 185, 187 (8th Cir.1986). A motion to dismiss will be granted only if "it appears beyond doubt that the Plaintiff can prove no set of facts which would entitle him to relief." *Id.; see Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). The Court reviews the present motion with these standards in mind.

## DISCUSSION

■ In support of its motion, the State argues that Autio's claims under the ADA, 42 U.S.C. §§ 12101–213, are barred by the Eleventh Amendment. Specifically, the State argues that the ADA claims against it must be dismissed because the State's Eleventh Amendment immunity has been neither waived nor lawfully abrogated by Congress. Moreover, once the ADA claims are dismissed, Autio's remaining state law claims, standing alone, fail for lack of federal subject matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1). For the purposes of this motion, the parties and the Court accept the State's position with respect to waiver. The Court, however, rejects the State's contention that Congress has failed to constitutionally abrogate the State's Eleventh Amendment immunity from suit brought under the ADA.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has held that the Eleventh Amendment proscribes federal actions against states unless consent to suit is "unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) (hereinafter, *"Pennhurst II"*). In addition, "Congress has power with respect to the rights protected by the Fourteenth Amendment to abrogate the Eleventh Amendment immunity...." *Id.* (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). In *Seminole Tribe of Florida v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court outlined the two-level inquiry to be used for determining whether immunity has been waived through congressional abrogation:

In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has "unequivocally expresse[d] its intent to abrogate the immunity," and

second, whether Congress has acted "pursuant to a valid exercise of power."

*Id.* at ——, 116 S.Ct. at 1123 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985)).

With regard to the first question, the Supreme Court has discussed the requisite level of specificity for determining whether Congress has indicated its intent to abrogate the States' immunity. In *Atascadero State Hospital v. Scanlon,* the Court emphasized the importance of Eleventh Amendment immunity and the caution with which issues of abrogation of that immunity should be approached. 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). The Court stated that its "'reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system.'" *Id.* (quoting *Pennhurst II,* 465 U.S. at 99, 104 S.Ct. at 907). In light of the seriousness afforded Eleventh Amendment immunity, the Court held that "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Id.* at 243, 105 S.Ct. at 3148.

The State concedes, and the Court agrees, that in the text of the ADA, Congress adequately expressed its intent to abrogate the States' Eleventh Amendment immunity. *See Duffy v. Riveland,* 98 F.3d 447, 452 (9th Cir.1996); *Mayer v. University of Minnesota,* 940 F.Supp. 1474,1477 (D.Minn.1996). In particular, the ADA provides:

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202. The Court finds that this language is sufficiently explicit to satisfy the first-level inquiry outlined in *Seminole Tribe.*

It is at the second part of the *Seminole Tribe* inquiry—whether Congress has acted pursuant to a valid exercise of its power—that the State presses its objections to suit in the instant action. By overruling the plurality opinion in *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), the *Seminole Tribe* Court unequivocally held that the only recognized authority for congressional abrogation of the States' immunity is section five of the Fourteenth Amendment. —— U.S. at ——–——, 116 S.Ct. at 1131–32. Thus, the issue before this Court is whether Congress enacted the ADA pursuant to a valid exercise of its enforcement powers in section five of the Fourteenth Amendment. The State argues that Autio's claims against it, arising under Title I of the ADA which deals with employment discrimination, cannot survive since (1) Congress did not sufficiently invoke the Fourteenth Amendment in adopting Title I, and (2) the enactment of Title I was not a proper exercise of Congress's power under section five of the Fourteenth Amendment. The Court addresses each argument in turn.

First, contrary to the State's assertions, Congress need not expressly articulate its intent to legislate under section five for its actions to be constitutionally valid. In *EEOC v. Wyoming,* the Court stated

It is in the nature of our review of congressional legislation defended on the basis of Congress's powers under § 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words "section 5" or "Fourteenth Amendment" or "equal protection" for "[t]he ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."

460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983) (citing *Fullilove v. Klutznick,* 448 U.S. 448, 476–78, 100 S.Ct. 2758, 2773–75, 65 L.Ed.2d 902 (1980); quoting *Woods v. Cloyd W. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596 (1948)). Even if there was such a requirement, it would have been fully satisfied here

since Congress unmistakably articulated the constitutional basis for the enactment. *See* 42 U.S.C. § 12101(b)(4) ("It is the purpose of this chapter ... to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment ... in order to address the major areas of discrimination faced day-to-day by people with disabilities."). Moreover, the State misplaces its reliance on *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (hereinafter, *"Pennhurst I"*), for the proposition that Congress must use unmistakably explicit language in expressing its intent to nullify the States' immunity. Since that decision, the High Court has noted that its

> task in [*Pennhurst I*] was to construe a statute, not to adjudge its constitutional validity....The rule of statutory construction invoked in *Pennhurst* was, like all rules of statutory construction, a tool with which to divine the meaning of otherwise ambiguous statutory intent Here, there is no doubt what the intent of Congress was....The observations in *Pennhurst* therefore simply have no relevance to the question of whether, in this case, Congress acted pursuant to its powers under § 5.

*Wyoming,* 460 U.S. at 243 n. 18, 103 S.Ct. at 1064 n.18 (analyzing constitutionality of the Age Discrimination in Employment Act, or ADEA) (citations omitted). As in *Wyoming,* Congress's intent in enacting the statute at issue is clear: to extend the application of the ADA to the States. *See* 42 U.S.C. § 12101(b)(4). Consequently, this Court rejects the State's contention that Autio's claims must fail because Congress did not clearly rely on section five of the Fourteenth Amendment in adopting Title I of the ADA.

 Second, the State contends that Title I of the ADA is not a proper exercise of Congress's Fourteenth Amendment enforcement powers. "Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1724, 16 L.Ed.2d 828 (1966). That power, however,

"extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment." *City of Boerne v. Flores,* —— U.S. ——, ——–——, 117 S.Ct. 2157, 2164–65, —— L.Ed.2d —— (1997); *see also Oregon v. Mitchell,* 400 U.S. 112, 128, 91 S.Ct. 260, 266–67, 27 L.Ed.2d 272 (1970) ("As broad as the congressional enforcement power is, it is not unlimited."). A statute is "appropriate legislation" under section five if it "may be regarded as an enactment to enforce the Equal Protection Clause, ... is 'plainly adapted to that end' and ... is not prohibited by but is consistent with 'the letter and spirit of the constitution.'" *Morgan,* 384 U.S. at 651, 86 S.Ct. at 1724 (quoting *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819)). The Court finds that Title I of the ADA meets each of these requirements.

Congress clearly enacted the ADA to enforce the Equal Protection Clause. Congress specifically stated that its purpose was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities...." 42 U.S.C. § 12101(b)(1). In addition, it noted that

> individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society....

§ 12101(a)(7); *see also* § 12101(b)(2) ("historically, society has tended to isolate and segregate individuals with disabilities and ... such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem...."); § 12101(a)(6) ("census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally...."). In short, the ADA may be viewed as a measure to

enforce the Equal Protection Clause by securing nondiscriminatory treatment for a discrete and identifiable class of person—individuals with disabilities—who have faced a historical pattern of unequal treatment. *See Mayer*, 940 F.Supp. at 1479–80.

In addition, the ADA is "plainly adapted" to furthering the aims of the Equal Protection Clause. The effect of the Act is to ensure that persons with disabilities are not subject to discriminatory state conduct and are afforded, among other things, employment opportunities on par with persons who are not disabled. *See* 42 U.S.C. § 12101(a)(3) ("discrimination against individuals with disabilities persists in such critical areas as employment...."); § 12101(a)(8) ("the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals...."); § 12101(a)(9) ("the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous ..."). The substantive provisions of Title I of the Act are specifically tailored to remedy the identified class discrimination in the area of employment.

■ Finally, the ADA is "consistent with the letter and spirit of the constitution." *Katzenbach v. Morgan*, 384 U.S. 641, 651, 86 S.Ct. 1717, 1724, 16 L.Ed.2d 828 (quotations omitted). Congressional power under section five "extends only to 'enforc[ing]' the provisions of the Fourteenth Amendment. The Court has described this power as 'remedial.'" *City of Boerne*, —— U.S. at ——, 117 S.Ct. at 2164 (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 326, 86 S.Ct. 803, 817–18, 15 L.Ed.2d 769 (1966)). The scope of this authority, however, does not extend to decreeing "the substance of the Fourteenth Amendment's restrictions on the States." *Id.* In other words, "Congress does not enforce a constitutional right by changing what the right is. It has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *Id.*

The Supreme Court has recently discussed this distinction and provided an analytical framework for analyzing legislation.

> While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. *There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.* Lacking such a connection, legislation may become substantive in operation and effect.

*Id.* (emphasis added). Here, Title I of the Act has a readily apparent remedial character. As Congress stated in its findings, "individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination...." 42 U.S.C. § 12101(a)(4). Moreover, the means employed by the ADA is congruent and proportionate to the injury to be remedied. The provisions of the Act are designed to eradicate discrimination against the class of disabled individuals as they experience it in day-to-day living, including the employment arena. *See* § 12101(a)(3). While the Act's mandates impose requirements upon the States that impact a range of official conduct, its effect is limited to protecting persons with disabilities from arbitrary discrimination.

These characteristics distinguish the ADA from the Religious Freedom Restoration Act (the "RFRA"), 42 U.S.C. §§ 2000bb to 2000bb–4, that was recently struck down by the Supreme Court in *City of Boerne v. Flores*, —— U.S. ——, 117 S.Ct. 2157. There, the Court declared the RFRA unconstitutional on the grounds that it exceeded Congress's Fourteenth Amendment enforcement powers. The RFRA legislation, by its express terns, altered the meaning of the Free Exercise Clause. *See id.* at ——–——, 117 S.Ct. at 2164–65. Specifically, the statute prohibited

"[g]overnment" from "substantially burden[ing]" a person's exercise of religion even if the burden results from a rule of

general applicability unless the government can demonstrate the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

*Id.* at ——–——, 117 S.Ct. at 2160–61 (quoting 42 U.S.C. § 2000bb–1); *see also* § 2000bb(b)(1) ("The purposes of this chapter are to restore the compelling interest test ... and to guarantee its application in all cases where free exercise of religion is substantially burdened...."). After noting the dearth of modern examples of religious bigotry in the legislative record, the Court went on to discuss the disproportionality between the injury to be prevented and the means adopted to that end. *See id.* at ——–——, 117 S.Ct. at 2170–71. In particular, the Court observed that the compelling interest test "is the most demanding test known to constitutional law." *Id.* at ——, 117 S.Ct. at 2171. "[The test] would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind....We make these observations ... to illustrate the substantive alterations ... attempted by RFRA." *Id.* (quotations and citation omitted). The ADA, however, stands in stark contrast to the sweeping coverage and ubiquitous intrusiveness of the RFRA. As discussed above, the ADA's scope and purpose is narrowly tailored to meet its limited equal protection goals.

In response, the State contends that Congress had no authority to enact the ADA to enforce the equal protection rights of disabled persons since discrimination against disabled persons, as a class, is subject only to rational basis review by the Supreme Court. Put another way, the State maintains "that because classifications involving disabled persons have been reviewed by the Supreme Court under a rational basis standard, disabled persons have no rights under the Equal Protection Clause, and Congress therefore may not act to prohibit states from discriminating against disabled persons." *Mayer,* 940 F.Supp. at 1479. The State's position mistakenly links Congress's power to legislate with respect to an identifiable class of individuals to the level of judicial scrutiny given legislation affecting that class. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 442–47, 105 S.Ct. 3249, 3255–58, 87 L.Ed.2d 313 (1985) (holding retarded persons not entitled to status as quasi-suspect class, but listing examples of legislation tailored to meet the unique problems they face and noting entitlement to equal protection from "invidious discrimination"). Furthermore, the State's assertion misconstrues the purpose of the Fourteenth Amendment and contravenes the traditional notion of separation of powers. As the Supreme Court stated in *Katzenbach v. Morgan,*

> a construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated the Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment. It would confine the legislative power in this context to the insignificant role of abrogating only those state laws that the judicial branch was prepared to adjudge unconstitutional, or of merely informing the judgment of the judiciary by particularizing the "majestic generalities" of § 1 of the Amendment.

384 U.S. at 648–49, 86 S.Ct. at 1722. "[T]he drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976); *see also Wyoming,* 460 U.S. at 260 n. 6, 103 S.Ct. at 1073 n. 6 (stating that the Court need not resolve whether Congress can define independently protected classes) (Burger, C.J., Powell, Rehnquist, O'Connor, J.J., dissenting); *Mayer,* 940 F.Supp. at 1479 (observing that Congress is not prevented "from finding that another class of persons has been subjected to a history of unequal treatment and legislating pursuant to its enforcement powers under the Fourteenth Amendment to protect that class of persons from arbitrary discrimination."). Thus, the Court concludes that Congress acted properly when it enacted the

ADA to eliminate discrimination against the class of disabled persons.

In addition, the State maintains that the ADA bears little resemblance to the statutes Congress has historically enacted pursuant to the Fourteenth Amendment because the Act is not designed to promote equal protection, but instead, provides differential treatment of dissimilarly-situated persons. This view, however, improperly truncates Congress's discretion and enforcement powers under section five. *See City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989) ("The power to 'enforce' may at times also include the power to define situations which *Congress* determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.") (emphasis in original); *Morgan,* 384 U.S. at 651, 86 S.Ct. at 1723–24 ("Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment."). "The Equal Protection Clause of the Fourteenth Amendment limits states' ability to discriminate on the basis of classifications." *Mayer,* 940 F.Supp. at 1479. "Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike...." *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971). In enacting the ADA, Congress has recognized that disabled persons encounter "various forms" of discrimination, among them being the prejudicial barriers to equal opportunity that arises when disabled persons are treated the same as non-disabled persons. 42 U.S.C. § 12101(a)(5). "[L]egislation ... singling out the [disabled] for special treatment reflects the real and undeniable differences between the [disabled] and others," *City of Cleburne,* 473 U.S. at 444, 105 S.Ct. at 3256, and is a proper measure to vindicate equal protection principles in the face of arbitrary discrimination. For all these reasons, the Court determines that the ADA is "appropriate legislation" under section five of the Fourteenth Amendment as a means to enforce the Equal Protection Clause with respect to persons with disabilities.

**CONCLUSION**

The Court concludes that Congress enacted the ADA to secure the equal protection rights of persons with disabilities pursuant to a valid exercise of its enforcement powers under section five of the Fourteenth Amendment. Defendant State of Minnesota is not entitled to Eleventh Amendment immunity from Plaintiff Autio's ADA claims. On that basis, the Court denies Defendant's Motion to Dismiss.

Accordingly, **IT IS HEREBY ORDERED THAT:**

Defendant State of Minnesota's Motion to Dismiss (Clerk Doc. No. 17) is DENIED.