Craig P. WALLIN, Plaintiff,

v.

**MINNESOTA DEPARTMENT OF CORRECTIONS, et al., Defendants.**

**Civ. No. 3-95-367.**

United States District Court, D. Minnesota, Third Division.

Aug. 8, 1997.

Stephen Charles Fiebiger, Fiebiger Law Office, Minneapolis, MN, for Plaintiff.

Kurt J. Erickson, Marsha Eldot Devine, Minn. Atty. Gen., St. Paul, MN, for Defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the Court upon Defendants' Motion for Dismissal and Summary Judgment. For the following reasons, the Court grants Defendants' motion.

## I. BACKGROUND

Plaintiff Craig P. Wallin began working for Defendant Minnesota Department of Corrections ("Corrections") at the Stillwater facility ("STW") in 1980, progressing from a Corrections Officer I to a Corrections Officer III by 1985. The record shows no problems with Wallin's job performance until 1991, when he was diagnosed with symptoms of depression.

In March 1992, Wallin was charged with gross misdemeanor assault against his live-in girlfriend. While the charge was pending, he entered a chemical dependency treatment program and returned to work on the condition that he remain chemical free for a period of three years. He eventually pleaded guilty to the assault charge and was sentenced to fifteen days in jail.

After the conviction for assault, Corrections sent Wallin a discharge letter. Then–Warden Robert A. Erickson cited as the cause of termination Wallin's criminal conviction and the negative message it sent to co-workers and inmates. Wallin's discharge became effective on August 27, 1992.

Wallin subsequently grieved his discharge through his union, AFSCME, pursuant to the collective bargaining agreement between AFSCME and the State of Minnesota. AFSCME reached a settlement with Corrections on behalf of Wallin, releasing all claims in return for Wallin's reinstatement at the same level of pay but with a demotion to Corrections Officer II. The settlement also provided for back pay and benefit accruals and contained a provision that Wallin's continued employment was contingent upon completion of his current treatment program.

Wallin returned to work on January 13, 1993. Problems between Wallin and his co-workers—in particular, Defendants Dennis Benson (Warden), David Corbo (Personnel Director), Elizabeth A. Hughes (Corrections Officer II), and Terry Bath (Corrections Officer II and III)—arose form the start. Wallin was accused of several transgressions, including calling co-workers derogatory names, mistreating and belittling inmates, breaching security, and threatening and intimidating Hughes. In turn, Wallin claims to have been harassed and discriminated against because of his disability, citing in particular one incident in which he overheard Bath make a reference to "alcoholic fuckers."

The incident between Wallin and Hughes, which occurred on April 20, 1993, prompted Corrections to convene a disciplinary committee to review allegations against Wallin. During the committee's investigation, Wallin was placed on a five-day investigatory suspension without pay. The committee recommended to Warden Benson that Wallin be terminated. Benson agreed and sent a discharge letter to Wallin on April 30, 1993. Also on that day, Wallin was given an opportunity to respond to the allegations against him and to the discharge letter. After the hearing, Benson carried out Wallin's discharge, citing a pattern of misconduct and the need to protect both STW employees and the public.

Wallin grieved this second discharge once again through AFSCME, pursuant to the collective bargaining agreement. The grievance was eventually arbitrated. The arbitrator reinstated Wallin but denied him back pay from the time of his discharge in April

1993 until he returned to work in May 1994. Wallin also filed a Charge of Discrimination with the EEOC. He remains employed with Corrections at STW.

Wallin now brings this action, alleging twelve counts against Defendant Corrections and against Defendants Benson, Corbo, Hughes, and Bath in their individual and official capacities. Six counts invoke federal jurisdiction under 28 U.S.C. §§ 1343 and 1331: violation of due process—property interest, violation of due process—liberty interest, violation of equal protection, conspiracy, violation of the Employee Retirement Income Security Act ("ERISA"), and violation of the Americans with Disabilities Act ("ADA"). The remaining six counts are supplemental state claims brought under 28 U.S.C. § 1367 for breach of contract, tortious interference with contract, defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, and violation of the Minnesota Human Rights Act ("MHRA"). Wallin asks the Court for compensatory and punitive damages, back pay, lost wages and benefits, and other equitable relief as the Court deems appropriate. Defendants move for summary judgment on the federal claims, alleging that Wallin has failed to raise a genuine issue of material fact on at least one element of each count. Defendants move for dismissal of the state claims on jurisdictional grounds or, in the alternative, for summary judgment for failure to raise a genuine issue of material fact on each claim.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P.56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219–20 (8th Cir.1992). To determine whether genuine issues of material fact exist, a court conducts a two-part inquiry. The court determines materiality from the substantive law governing the claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts which might affect the outcome of the lawsuit according to applicable substantive law are material. See id. A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the nonmoving party. See id. at 248–49, 106 S.Ct. at 2510–11.

Because discrimination is difficult to prove by direct evidence, courts should not grant summary judgment in employment discrimination cases "unless the evidence could not support any reasonable inference for the nonmovant." Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir.1995) (quoting Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir.1994)); see also Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir.1991). Summary judgment is appropriate only when a plaintiff fails to establish a factual dispute on each element of the prima facie case. See Bialas v. Greyhound Lines, Inc., 59 F.3d 759, 762 (8th Cir.1995).

## III. DISCUSSION

### A. Release of Claims

■ The Settlement and Release between the State of Minnesota, Department of Corrections, MCF–Stillwater and Minnesota State Employees Union, AFSCME, Council 6, AFL–CIO ("Settlement Agreement") is clear and unambiguous. Entered into on December 11, 1992 "to resolve the grievance of Mr. Craig Wallin," the Settlement Agreement declares its purpose to be "to finally and forever resolve this grievance and all disputes regarding this matter." (Second Amended Compl. Ex. A.) To this end, paragraphs seven and eight state:

7. The parties agree that this Settlement and Release is made for the purpose of releasing and discharging each other (including their employees, agents, officers and officials jointly and severally, individually and in their official capacities) by compromising and finally settling all claims, differences, grievances and causes of action against the above-noted parties based on any and all acts or omissions allegedly committed by them, including but not limited to, claims based upon contract, employment agreement, violation of statutory law, violation of civil or constitutional right, or tortuous [sic] conduct arising from or in any way connected with the parties' em-

ployment relationships, up to and including the date of this Settlement and Release. 8. This Settlement and Release waives or releases rights or remedies provided under Minnesota Statutes, Chapter 363, the Human Rights Act. This document constitutes written notice to the signatory party of the right to rescind this waiver or release within 15 calendar days of its execution by all parties. To be effective, the rescission must be placed in writing and be delivered to the departmental representative signing below either by hand or mail within the 15 calendar day period.

*Id.*

Defendants argue that the Settlement Agreement bars Wallin from asserting any claims arising from acts on or before December 11, 1992. Defendants contend that Wallin voluntarily accepted the terms of the agreement and is therefore bound by it. In support, Defendants adduce evidence that Wallin signed the agreement, stating, "I understand and voluntarily accept the terms of this Settlement and Release," and that Wallin testified in his deposition that he had indeed agreed to the Settlement Agreement. (Wallin Dep. at 318–20.) Moreover, Defendants note that Sid Helseth, the representative who signed the Settlement Agreement for AFSCME, testified that Wallin was a party to and had authority to revoke the agreement, and that Attorney Fiebiger wrote a letter to Helseth suggesting that Wallin was releasing all claims under the agreement. (*See* Helseth Dep. at 12–13, 16, 18–20, 90–91, Exs. 1 and 2.)

Wallin counters that the Settlement Agreement was between AFSCME and Corrections only and that he was not a party to it. Therefore, he argues, he is not bound by it and has not released any of his claims prior to December 11, 1992. (*See* Pl.'s Mem. Opp'n Summ. J. at 8 n. 4.)

Wallin, however, cites no authority to support his contention that the Settlement Agreement between Corrections and AFSCME, expressly entered into "to resolve the grievance of Mr. Craig Wallin," somehow does not bind him. (Second Amended Compl. Ex. A). More accurately, Wallin provides no support for his claim that the Settlement Agreement binds Corrections to confer on him the benefit of reinstatement at the same level of pay, binds Corrections even to the extent that any breach on its part may be actionable by Wallin himself (cf. Count VI—Breach of Contract), yet requires no legal detriment on his part as consideration.

Absent any countervailing authority, the Eighth Circuit decision in *Pilon v. University of Minnesota*, 710 F.2d 466 (8th Cir.1983), controls. In that opinion, the Eighth Circuit held that where the language of a release "is clear and leaves no doubt that all claims . . . are waived," and where the release is a "negotiated contract agreement," the party on whose behalf the release was negotiated is bound by the agreement. *Id.* at 467–68. Furthermore, absent any showing of fraud or duress, a court need not "inquire into the voluntariness of the employee's consent." *Id.* at 468.

Because the Settlement Agreement was negotiated by Wallin's union on his behalf, because the language of the Settlement Agreement is unambiguous, and because Wallin declined to exercise his right to rescind the Settlement Agreement within the stipulated fifteen-day period, Defendants are entitled to summary judgment on this issue. Therefore, the Court grants Defendants' motion for summary judgment and bars Wallin from asserting all claims against Corrections arising from acts occurring on or before December 11, 1992.

### B. *Counts I and II: Due Process—Property and Liberty Interests*

Wallin brings his procedural due process claim pursuant to 42 U.S.C. § 1983, which prohibits a state actor from violating an individual's constitutional rights. The Fourteenth Amendment to the United States Constitution proscribes state action that deprives any person of life, liberty, or property without due process of law. *See* U.S. Const. amend. XIV, § 1. Wallin asserts that Defendants Benson and Corbo deprived him of a protected property interest without procedural due process when they discharged him from his employment with Corrections without sufficient pre-and post-termination procedures. Wallin further contends that Defendants Benson and Hughes deprived him of a protected liberty interest without procedural due process when they falsely disparaged

and stigmatized him without those same procedures.

In order to prevail on his property interest due process claim, then, Wallin must establish that (1) he had a protected property interest in his employment with Corrections, and (2) Benson and Corbo deprived him of this right without due process of law. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). For the liberty interest claim, Wallin must show that (1) Benson and Hughes, while acting under color of state law, falsely disparaged and stigmatized him, and (2) Benson and Hughes did so without providing him notice of the remarks and without affording him the opportunity to respond to them and clear his name. *See Board of Regents v. Roth*, 408 U.S. 564, 572–73, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548 (1972).

Defendants concede that Wallin has a protected property interest in continued employment with Corrections. Moreover, they concede that, for summary judgment purposes only, Benson's discharge letter constitutes a "stigma" sufficient to raise a genuine issue of material fact on the first element of a liberty interest due process claim. Therefore, the Court's decision on these two counts hinges on the second element of a due process claim—namely, whether Wallin received the process that was due.

"The essential requirements of due process, ... are notice and an opportunity to respond." *Loudermill*, 470 U.S. at 546, 105 S.Ct. at 1495. This *Loudermill* hearing "applies equally to liberty interests and property interests." *Schleck v. Ramsey County*, 939 F.2d 638, 642 n. 5 (8th Cir.1991). The Eighth Circuit has interpreted *Loudermill* to imply that a pre-termination name-clearing hearing may be required in a liberty interest claim—as it is where a property interest is implicated—and that "the scope of such a hearing is dictated by *Loudermill*." *Id.* at 643 n. 5.

Under *Loudermill*, a pre-termination hearing "need not be elaborate"; indeed, " 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative ac-

tion." *Loudermill* at 545, 105 S.Ct. at 1495 (citing *Mathews v. Eldridge*, 424 U.S. 319, 343, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976)). The hearing need not produce a particular result to achieve its purposes—namely, to guard against mistakes in termination decisions, on one hand, and to "clear the air" of stigmas attached to name and reputation, on the other. *See id.* at 545–46, 105 S.Ct. at 1495. Rather, the hearing must only be held. "Post-termination administrative procedures" are also required under *Loudermill*. *See id.* at 547–48, 105 S.Ct. at 1496.

■ Wallin advances two arguments in support of his claim that he was denied due process regarding his property interest. First, he contends that the decision to terminate him was made prior to his *Loudermill* hearing, and therefore he was deprived of his property interest before the required pre-termination hearing. Second, he argues that the arbitration proceeding which eventually resulted in his reinstatement was insufficient under *Loudermill*'s post-termination requirement, since it took place nearly one year after his termination.

■ Regarding his liberty interest claim, Wallin seems to think that establishing that Benson and Hughes stigmatized his name and reputation entitles him to survive summary judgment. This is not so. "Mere publication of a false stigmatizing reason for discharge, intentional or otherwise, is not actionable under § 1983 unless the injured party was denied the opportunity to refute the charge." *Nelson v. City of McGehee*, 876 F.2d 56, 58 (8th Cir.1989) (citing *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707). "It is the denial of due process, not the alleged defamation *per se*, which triggers a federal cause of action." *Id.* at 58 (citing *Paul v. Davis*, 424 U.S. 693, 709–12, 96 S.Ct. 1155, 1164–66, 47 L.Ed.2d 405 (1976)).

Defendants assert that Corbo is not a proper defendant in the property interest claim, because he did not actually terminate Wallin. They also raise some questions regarding Hughes' status in the liberty interest action. The Court need not decide these issues, as its analysis of the *Loudermill* hearings is sufficient for the disposition of both actions.

The crux, then, of the due process issues in this case lies in determining whether Wallin received a *Loudermill* hearing prior to his discharge, and whether the administrative post-termination procedures were adequate. *Loudermill* makes clear that the pre-termination hearing must take place before the actual deprivation of a property interest. The "'root requirement' of the Due Process Clause [is] that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Loudermill*, 470 U.S. at 542, 105 S.Ct. at 1493 (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 786–87, 28 L.Ed.2d 113 (1971) (emphasis in original)). The hearing must occur "prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Id.* (citing *Roth*, 408 U.S. at 569–70, 92 S.Ct. at 2705; *Perry v. Sindermann*, 408 U.S. 593, 599, 92 S.Ct. 2694, 2698–99, 33 L.Ed.2d 570 (1972)). Perhaps most clearly and unequivocally expressed, the hearing must take place "before the termination takes effect." *Id.* at 543, 105 S.Ct. at 1494 (citing *Goss v. Lopez*, 419 U.S. 565, 583–84, 95 S.Ct. 729, 740–41, 42 L.Ed.2d 725; *Gagnon v. Scarpelli*, 411 U.S. 778, 784–86, 93 S.Ct. 1756, 1760–62, 36 L.Ed.2d 656 (1973)). Thus, it is permissible to determine to discharge an employee before the *Loudermill* hearing; it is not permissible to have the discharge "take effect" beforehand. Wallin was given the opportunity to challenge the reasons for the dismissal decision before he was actually terminated. Because Wallin's discharge did not take effect until after his *Loudermill* hearing, he was given appropriate due process.

In its analysis of the post-termination hearing, the *Loudermill* Court deferred to the administrative procedures of the controlling Ohio statute. *See id.* at 546–48, 105 S.Ct. at 1495–96. The Court found that the mere assertion that the procedure took a long time "does not state a claim of constitutional deprivation." *Id.* at 547, 105 S.Ct. at 1496. In the instant case, the collective bargaining agreement between AFSCME and Corrections supplied the proper post-termination administrative procedure. Wallin was granted arbitration. As long as the procedure was proper—and Wallin has made no

claim that it was not, only that it took nearly a year—it is sufficient. Indeed, that Wallin was ordered reinstated by the arbitrator militates in favor of its adequacy.

At his *Loudermill* hearing, Wallin was also given the opportunity to respond to Benson and Hughes' allegedly false statements about him. Because the *Loudermill* hearing "applies equally to liberty interests and property interests," *Schleck*, 939 F.2d at 642 n. 5, the Court concludes that Wallin was given due process as to both interests. Wallin fails to raise a genuine issue of material fact on the second element of a due process § 1983 claim—namely, that he was denied due process. Therefore, Defendants' Motion for Summary Judgment on Counts I and II is granted.

### C. *Count IV: Conspiracy*

█ Wallin has presented no evidence of a conspiracy under 42 U.S.C. § 1985. He has merely alleged that two or more persons have deprived him of his constitutional rights, and that this allegation is in itself sufficient to raise a genuine issue of conspiracy. This is a false assumption.

In order to raise a genuine issue of conspiracy under § 1985, Wallin must "point to at least some facts which would suggest that [Defendants] 'reached an understanding' to violate [his] rights." *Nelson*, 876 F.2d at 59 (quoting *Myers v. Morris*, 810 F.2d 1437, 1454 (8th Cir.1987)). Moreover, "allegations of a conspiracy must be pleaded with sufficient specificity and factual support to suggest a 'meeting of the minds' directed toward an unconstitutional action." *Id.* (quoting *Myers*, 810 F.2d at 1454; and *Deck v. Leftridge*, 771 F.2d 1168, 1170 (8th Cir.1985)).

Because Wallin's allegations of conspiracy have neither been pleaded with sufficient specificity nor supported by facts suggesting Defendants reached an agreement to deprive him of his constitutional rights, Wallin has failed to raise a genuine issue of material fact regarding conspiracy. Therefore, Defendants' Motion for Summary Judgment on Count IV is granted.

### D. *Count V: ERISA*

Wallin asserts in Count V that Corrections wrongfully violated his rights under ERISA

by discharging him for the purpose of interfering with those rights. For the reasons outlined below, Wallin's claim must fail.

■ Defendants argue in the first instance that Wallin's claim is barred by the Eleventh Amendment to the United States Constitution. Wallin counters that it is not. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has held that the Eleventh Amendment proscribes federal actions against states unless consent to suit is "unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). In addition, "Congress has power with respect to the rights protected by the Fourteenth Amendment to abrogate the Eleventh Amendment immunity." *Id.* (citing *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). In *Seminole Tribe of Florida v. Florida,* 517 U.S. 609, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court outlined the two-part inquiry to be used for determining whether immunity has been waived through congressional abrogation:

> In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether Congress has "unequivocally expresse[d] its intent to abrogate the immunity," and second, whether Congress has acted "pursuant to a valid exercise of power."

*Id.* at ——, 116 S.Ct. at 1123 (quoting *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985)).

Regarding the first part of the inquiry, the Supreme Court in *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), held that "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Id.* at 243, 105 S.Ct. at 3148. There is no such clear statement in ERISA. Wallin only asserts that ERISA contains a federal "jurisdictional mechanism" in 29 U.S.C. § 1132 (Pl's Mem. Opp'n Summ. J. at 60), but this section of the statute—indeed, the entire statute—is silent about the Eleventh Amendment.

This failure to pass the first part of the test should properly end the analysis. However, should a clear statement somehow be inferred from the language of the statute, Wallin's argument would fail the second element—namely, whether Congress acted "pursuant to a valid exercise of power." In *Seminole Tribe,* the Supreme Court held that the only recognized authority for congressional abrogation of the States' immunity is section five of the Fourteenth Amendment. *See* 517 U.S. at —— – ——, 116 S.Ct. at 1131–32. As Wallin points out, however, Congress need not have expressly articulated its intent to legislate under section five of the Fourteenth Amendment for its action to be constitutionally valid. In *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), the Supreme Court stated:

> It is in the nature of our review of congressional legislation defended on the basis of Congress's powers under § 5 of the Fourteenth Amendment that we be able to discern some legislative purpose or factual predicate that supports the exercise of that power. That does not mean, however, that Congress need anywhere recite the words "section 5" or "Fourteenth Amendment" or "equal protection" for "[t]he ... constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise."

*Id.* at 243 n. 18, 103 S.Ct. at 1064 n. 18.

Nevertheless, the Court finds no discernible legislative purpose to support the contention that Congress enacted ERISA pursuant to section five of the Fourteenth Amendment. Indeed, the statute explicitly invokes Congress's commerce power as its enacting authority. *See* 29 U.S.C. §§ 1001b(a)(1) and (c), and 1001a(a)(1) and (c)(1). Unlike the ADA, which Wallin cites and which invokes both the commerce power and the Fourteenth Amendment, ERISA says nothing about the Fourteenth Amendment. The Court concludes, then, that because ERISA does not pass either element of the *Seminole Tribe* two-part analysis, ERISA does not ab-

rogate the States' Eleventh Amendment immunity.

■ Finally, even if Eleventh Amendment immunity were abrogated, Wallin's claim would not survive summary judgment on the merits. "In order for an employee to establish a prima facie case under section 510 of ERISA, he must demonstrate '(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'" *Guarnaccia v. John Wanamaker, Inc.*, No. Civ. A. 88–6507, 1990 WL 90490, at *7 (E.D.Pa.) (quoting *Hendricks v. Edgewater Steel Co.*, 898 F.2d 385, 389 (3rd Cir. 1990)). Wallin does little more than allege that he was discharged "for the purpose of" denying his rights under ERISA; he supplies no factual support for his allegation. "No ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Nelson v. J.C. Penney Co.*, 858 F.Supp. 914, 924 (N.D.Iowa 1994) (quoting *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y. 1982)). Therefore, Wallin must demonstrate "that Defendant terminated him with the specific intention of depriving him of his ERISA benefits." *Id.* at 924; *see also Turner v. Schering–Plough Corp.*, 901 F.2d 335, 348 (3rd Cir.1990) (losing opportunity to accrue benefits due to employee's discharge "not alone probative of an intent to interfere with pension rights"). Wallin has alleged no such specific intent; the Court thus grants Defendants' Motion for Summary Judgment on Count V.

### E. *Count XI: ADA*

■ Wallin asserts in Count XI a claim under the ADA. Defendants again argue that such a claim is barred by the Eleventh Amendment. Unlike ERISA, however, the ADA contains a clear statement of the statute's intent to abrogate the States' Eleventh Amendment immunity; in addition, the ADA was constitutionally enacted under section five of the Fourteenth Amendment. This Court has recently held, and now reaffirms, that ADA claims are not subject to Eleventh Amendment immunity. *See Autio v. State of Minnesota*, 968 F.Supp. 1366, 1372 (D.Minn. 1997); *see also Mayer v. University of Minn.*, 940 F.Supp. 1474, 1477 (D.Minn. 1996).

■ The Court thus turns to the merits of Wallin's ADA claim. To obtain relief under the ADA, a plaintiff must establish (1) that he has a disability as defined in 42 U.S.C. § 12102(2); (2) that he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) that he has suffered an adverse employment action because of his disability. *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir.1995).

The ADA defines disability as (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such impairment. 12102(2). Wallin claims that his depression and alcoholism constitute disabilities under the ADA. Defendant Corrections contests that claim, but only with regard to Wallin's alleged depression. Corrections fails to address Wallin's evidence of alcoholism, a condition covered as a disability under the ADA. *See Larson v. Koch Refining Co.*, 920 F.Supp. 1000, 1004 (D.Minn. 1996) (citing *Khalifa v. Gruys, Johnson & Assoc.*, 407 N.W.2d 733, 735 (Minn.Ct.App. 1987); *Schmidt v. Safeway, Inc.*, 864 F.Supp. 991, 996 (D.Or.1994)). The evidence shows, however, that Wallin sought help for both depression and alcoholism, and that Corrections knew about his treatment. Indeed, the Settlement Agreement reached between Corrections and AFSCME specifically noted in paragraph 6 that "[c]ontinued employment is contingent upon completion by the grievant [Wallin] of the current scheduled treatment program." (Second Amend. Compl. Ex. A.) Given such evidence and Corrections' knowledge of it, the Court assumes, without deciding, that Wallin has raised a genuine issue of material fact with regard to the first element of his ADA claim.

As neither party raises an issue regarding the second element of an ADA claim, the Court now turns to the third element—namely, whether Wallin has suffered an adverse employment action because of his disability.

Wallin proposes two theories to meet his burden: first, that he was discharged be-

cause of his disability and, second, that he was harassed in the workplace because of his disability. The key phrase in both these theories is "because of." There is no cause of action within the plain meaning of the ADA for discharge or harassment that is not "because of" a plaintiff's disability.

This Court has held that while the ADA "protect[s] an individual's status as an alcoholic," an employer "need not tolerate misconduct.... [A]lcoholics are not protected from the consequences of their conduct." *Larson,* 920 F.Supp. at 1004 (quoting *Flynn v. Raytheon,* 868 F.Supp. 383, 386–87 (D.Mass.1994)). It is clear from an examination of the record that Wallin was discharged because of an ongoing pattern of misconduct. Affidavits have been filed attesting to Wallin's inappropriate conduct, which included calling co-workers derogatory names, making prurient comments to an inmate, mistreating and belittling an inmate, breaching security, and berating, threatening, and intimidating Hughes. Wallin has admitted to mistreating and belittling the inmate and to the breach of security. The incident with Hughes prompted Corrections to initiate an investigation of all allegations against Wallin, resulting in the decision to discharge him. All proper procedures, including a *Loudermill* hearing, were followed. Regardless of whether Wallin's conduct stemmed from his disability, the record shows that he was discharged "because of" that conduct, not because of the disability. This is permissible under the ADA.

■ The ADA, however, requires an employer to make reasonable accommodations to an otherwise qualified employee with a disability, unless the employer can show that the accommodation would cause undue hardship. *See* 42 U.S.C. § 12112(b)(5)(A). Nevertheless, "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Miller v. National Cas. Co.,* 61 F.3d 627, 630 (8th Cir.1995) (quoting 29 C.F.R.App. § 1630.9). The only accommodation that Wallin alleges he requested was a transfer to another facility within the Department of Corrections.[1] Yet he fails to show how such a transfer would constitute an "accommoda-

tion" for his *particular* disability; instead, he cites *Benson* to show that a transfer can be a reasonable accommodation *for some disabilities. See Benson,* 62 F.3d at 1108. This is an important distinction, and because of it *Benson* is readily distinguishable on the facts.

In *Benson,* the employee was an airline mechanic who suffered complications from a rare neurological disorder which precluded repetitive use of his left arm and shoulder. Because such use was essential to the job of mechanic, the employee requested a transfer to another division—specifically, Engineering or Recycling—where he would not need to use his disabled limbs. *Id.* at 1114. In the instant case, had Wallin been transferred to another facility within the Department of Corrections, he would presumably still have had to perform the same functions as were required at STW. Wallin has not shown that it would have been otherwise. As such, it is hard to see how a transfer would constitute reasonable accommodation for his disability. Therefore, Corrections did not violate the ADA by denying the transfer.

■ Wallin's second theory, that he suffered workplace harassment because of his disability, takes the Court into a nebulous area of the law, an area not made any clearer by Wallin's failure to cite any cases in support of his arguments that Corrections' treatment of him constituted harassment, and therefore discrimination under the ADA. Some courts have appropriated the standard set forth in *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), a Title VII case, for use in ADA claims. *See Mannell v. American Tobacco Co.,* 871 F.Supp. 854, 860 (D.C.E.D. Virginia 1994). Under that standard, "the plaintiff must prove that the harassment creates an objectively hostile or abusive work environment and that the putative victim subjectively perceives the environment to be abusive." *Id.* (citing *Harris,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295). Moreover, the plaintiff must show that the defendant not only "created an objectively hostile or abusive work

---

**1.** Wallin also alleges that his disability could have been accommodated by a leave of absence or time off, but since he never requested either from Corrections, Corrections was not required to consider it. *See Miller,* 61 F.3d at 630.

environment," but that the defendant "did so in a discriminatory manner because of [the plaintiff's] disability." *Id.* "[A] mere offensive utterance" is insufficient. *Id.* (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. at 371).

None of Wallin's allegations of harassment can be properly construed to meet this standard. None raise a genuine issue that the harassing conduct was "because of" Wallin's disability. Indeed, Wallin merely lists a series of disconnected, albeit unpleasant, incidents. One such incident occurred outside the workplace in a restaurant. Another incident of "harassment" involved Corbo's request for a progress report on Wallin's treatment for depression and alcoholism—a condition for continued employment agreed to by Wallin and stipulated in the Settlement Agreement. Other incidents—a co-worker's comment that he did not want to work with Wallin, Bath's pushing a laundry cart into Wallin—show puerile behavior, but not behavior prompted "because of" Wallin's disability. *See McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir.1996) (harassment of worker "'because of' [co-workers'] vulgarity and insensitivity and meanness of spirit," but not because of the plaintiff's sex and therefore not actionable in a Title VII gender discrimination claim).

The only incident from which discriminatory intent regarding disability could plausibly be inferred is Bath's aside about "alcoholic flickers" that Wallin overheard. This deplorable comment, however, rises no further than the level of a "mere offensive utterance" and therefore falls short of the standard for actionable harassment under the ADA. Moreover, Bath apologized to Wallin for the comment, which is of course appropriate under the circumstances.

Because Wallin has failed to raise a genuine issue of material fact that he has suffered adverse employment action "because of" his disability, the Court grants Defendant's Motion for Summary Judgment on Count XI.

### F. *Count III: Equal Protection*

Wallin alleges a violation of his Fourteenth Amendment right to equal protection under 42 U.S.C. § 1983. He relies on *Hicks v. Saint Mary's Honor Center*, 970 F.2d 487 (8th Cir.1992), for the proposition that if he prevails on his ADA claim, then he is entitled to relief under § 1983. Wallin reasons by analogy to arrive at this proposition, because *Hicks* was a Title VII race discrimination case.

The Court first notes that *Hicks* was reversed by the Supreme Court, though on other grounds. *Saint Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The Court also notes the difference between race discrimination, subject to strict scrutiny in an equal protection claim, and disability discrimination, subject to rational basis analysis. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The Court further notes that the Eleventh Circuit has held that "a plaintiff may not maintain a section 1983 action in lieu of—or in addition to—a Rehabilitation Act or ADA cause of action if the only alleged deprivation is of the employee's rights created by the Rehabilitation Act and the ADA." *Holbrook v. City of Alpharetta, Georgia*, 112 F.3d 1522, 1531 (11th Cir.1997). "To permit a plaintiff to sue both under the [Rehabilitation Act and the ADA] that set forth detailed administrative avenues of redress as well as section 1983 would be duplicative at best; in effect, such a holding would provide the plaintiff with two bites at precisely the same apple." *Id.*

This Court need not proceed, however, along any of these analytical lines, because Wallin has not prevailed on his ADA claim and, therefore, by his own reasoning under *Hicks*, is not entitled to relief under § 1983. Defendants' Motion for Summary Judgment is thus granted on Count III.

### G. *Counts VI–X, XII: State Claims*

Counts VI–X and XII are state claims for breach of contract, tortious interference with contract, defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, and aiding and abetting liability under the MHRA. Because this Court grants Defendants' Motion for Summary Judgment on all of Wallin's federal claims, it is appropriate that the Court decline supplemental jurisdiction over all state claims. *See* 28 U.S.C. § 1367(c)(3). There-

fore, Wallin's state claims are dismissed without prejudice.

## IV. CONCLUSION

To survive summary judgment, Wallin must raise a genuine issue of material fact on each element of every claim. He has not done so on his federal claims. Defendants' Motion for Summary Judgment is therefore granted with respect to all federal claims, and Defendants' Motion for Dismissal is granted on all state claims.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants Minnesota Department of Corrections, Dennis Benson, David Corbo, Elizabeth A. Hughes, and Terry Bath's Motion for Dismissal and Summary Judgment is GRANTED with respect to Counts I and II (Due Process), Count III (Equal Protection), Count IV (Conspiracy), Count V (ERISA), and Count XI (ADA);

2. Counts I–V and XI of the Complaint are DISMISSED WITH PREJUDICE;

3. The Court declines to exercise jurisdiction over Plaintiffs' state causes of action. Therefore, Counts VI–X and XII of the Complaint are DISMISSED WITHOUT PREJUDICE.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**